UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSE JAMES PELLERITI, | No. 2:19-cv-1853 DAD AC P |
| Plaintiff, | |
| v. | FINDINGS & RECOMMENDATIONS |
| DANA AVILA, et al., | |
| Defendants. | |

Plaintiff is a former state prisoner proceeding pro se with a civil rights action pursuant to 42 U.S.C. § 1983. Currently before the court is defendants' motion for summary judgment. ECF No. 77.

I.     Procedural History

This case proceeds on the first amended complaint (ECF No. 14), which was screened and found to state claims for deliberate indifference against defendants Greenleaf, Avila, Longoria, and Christensen (ECF No. 20). Defendant Longoria was dismissed from the case after she died and plaintiff failed to substitute a successor or representative. ECF No. 68. After the close of discovery, defendants filed a motion for summary judgment, which plaintiff opposes. ECF Nos. 77, 80.

////

////

1

II.     Plaintiff's Allegations

Plaintiff alleges that between March 20 and June 15, 2016, defendant medical providers—Dr. Greenleaf, RN Avila, and NP Christensen—failed to diagnose or treat the increasing discoloration, swelling, and pain in plaintiff's right toes, foot, and leg, ultimately misdiagnosing his condition as shingles. ECF No. 14 at 7-10. When plaintiff was admitted to an outside hospital for emergency care in January 2017, he was diagnosed with deep vein thrombosis that required arterial surgery and toe amputation and resulted in a pulmonary embolism. Id. at 12.

III.    Motion for Summary Judgment

A.      Defendants' Arguments

Defendants argue they are entitled to summary judgment because they timely and properly addressed plaintiff's serious medical condition and therefore were not deliberately indifferent to his medical need. ECF No. 77-1 at 12-19. Alternatively, they argue that they are entitled to qualified immunity. Id. at 19-20.

B.      Plaintiff's Response

"Pro se litigants must follow the same rules of procedure that govern other litigants." King v. Atiyeh, 814 F.2d 565, 567 (9th Cir. 1987) (citation omitted), overruled on other grounds, Lacey v. Maricopa County, 693 F.3d 896, 928 (9th Cir. 2012) (en banc). However, it is well-established that district courts are to "construe liberally motion papers and pleadings filed by *pro se* inmates and should avoid applying summary judgment rules strictly." Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010). The unrepresented prisoner's choice to proceed without counsel "is less than voluntary" and they are subject to "the handicaps . . . detention necessarily imposes upon a litigant," such as "limited access to legal materials" as well as "sources of proof." Jacobsen v. Filler, 790 F.2d 1362, 1364 n.4 (9th Cir. 1986) (alteration in original) (citations and internal quotation marks omitted). Inmate litigants, therefore, should not be held to a standard of "strict literalness" with respect to the requirements of the summary judgment rule. Id. (citation omitted).

Accordingly, though plaintiff has largely complied with the rules of procedure, the court will consider the record before it in its entirety. However, only those assertions in the opposition

which have evidentiary support in the record will be considered.

Plaintiff argues that defendants are not entitled to summary judgment because they were deliberately indifferent as to his urgent need for medical care and they are not entitled to qualified immunity. ECF No. 80 at 19-25.

### IV.    Legal Standards for Summary Judgment

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Under summary judgment practice, "[t]he moving party initially bears the burden of proving the absence of a genuine issue of material fact." In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

"Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325); see also Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.  In such a circumstance, summary judgment should "be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id.

////

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(c). The opposing party must demonstrate that the fact in contention is material, i.e., a fact "that might affect the outcome of the suit under the governing law," and that the dispute is genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968). Thus, the "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matsushita, 475 U.S. at 587 (citation and internal quotation marks omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact, [the court] draw[s] all inferences supported by the evidence in favor of the non-moving party." Walls v. Cent. Contra Costa Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011) (citation omitted). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Neilsen Freight Lines, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586 (citations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Id. at 587 (quoting First Nat'l Bank, 391 U.S. at 289).

Defendants simultaneously served plaintiff with notice of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure along with their motion for summary judgment. ECF No. 77 at 2-3; see Klingele v. Eikenberry, 849 F.2d 409, 411 (9th Cir. 1988) (pro se prisoners must be provided with notice of the requirements for summary judgment); Rand v. Rowland, 154 F.3d 952, 960 (9th Cir. 1998) (en banc) (movant may provide notice).

V. Legal Standard for Deliberate Indifference to a Serious Medical Need

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). This requires plaintiff to show (1) "a 'serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain'" and (2) "the defendant's response to the need was deliberately indifferent." Id. (some internal quotation marks omitted) (quoting McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992)).

Deliberate indifference is a very strict standard. It is "more than mere negligence." Farmer v. Brennan, 511 U.S. 825, 835 (1994). Even civil recklessness—failure "to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known"—is insufficient to establish an Eighth Amendment claim. Id. at 836-37 (citation omitted). A prison official will be found liable under the Eighth Amendment when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. A plaintiff can establish deliberate indifference "by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." Jett, 439 F.3d at 1096 (citing McGuckin, 974 F.2d at 1060).

A difference of opinion between inmate and prison medical personnel—or between medical professionals—regarding the appropriate course of treatment does not by itself amount to deliberate indifference to serious medical needs. Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989). To establish that a difference of

5

opinion rises to the level of deliberate indifference, plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances." Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996) (citation omitted).

### VI.     Evidentiary Issues

Rule 56(c)(4) of the Federal Rules of Civil Procedure states that affidavits and declarations submitted for or against a summary-judgment motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." In other words, only admissible evidence may be considered by the court. Beyene v. Coleman Sec. Servs., Inc., 854 F.2d 1179, 1181 (9th Cir. 1988) (citations omitted). Statements in affidavits that are legal conclusions, speculative assertions, or statements of hearsay evidence do not satisfy the standards of personal knowledge, admissibility, and competence required by Rule 56(c)(4). Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (citations omitted).

Defendants object to paragraphs 4-6, 9-12, 14-15, and 17-18 of plaintiff's declaration as lacking foundation and—with the exception of paragraphs 14, 17, and 18—calling for a medical opinion. ECF No. 81 at 9-10. To the extent plaintiff's declaration contains medical or legal conclusions, the court agrees that plaintiff has not established competency as a medical expert or a foundation for any medical conclusions, and legal conclusions are not facts upon which summary judgment can be supported. See F.T.C. v. Publ'g Clearing House, Inc., 104 F.3d 1168, 1171 (9th Cir. 1997), as amended (Apr. 11, 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." (citations omitted)). Defendants' objections will therefore be sustained, and all medical or legal conclusions in plaintiff's declaration will be disregarded.

### VII.    Material Facts

As an initial matter, plaintiff objects to and disputes a number of defendants' facts as inaccurately portraying the contents of documents. Since plaintiff does not challenge the

////

////

accuracy of the documents themselves,[1] the court will therefore look to the documents directly in determining their content where plaintiff raises such disputes.

Plaintiff was incarcerated at High Desert State Prison (HDSP) from August 2015 to June 2017. Defendants' Statement of Undisputed Facts (DSUF) (ECF No. 77-2) ¶ 1; Response to DSUF (ECF No. 80 at 28-38) ¶ 1. During the relevant time period, defendant Greenleaf was a physician at HDSP, primarily assigned to the Treatment & Triage Area (TTA) in the prison's hospital. DSUF ¶ 2; Response to DSUF ¶ 2. Defendant Christensen was a nurse practitioner at HDSP and was plaintiff's primary care provider (PCP) while she was assigned to plaintiff's yard. Id. Defendant Avila was a registered nurse assigned to the medical clinic where plaintiff was housed. Id.

On March 9, 2016, plaintiff began experiencing what he believed was nerve pain in his right big toe and right foot. ECF No. 14 at 7, ¶ 1.[2] On March 20, 2016, he submitted a Health Care Services Request Form (7362 form) for medical services which stated the following:

> For the last month I have been having pain in my right foot & it's getting worse. I think it's the nerve because I will feel pain up my leg. Can you please pull me in to get it looked at. Thanks! Numbness in toes & discolored, looks like lack of blood flow. Also a tingling painful sensation.

ECF No. 77-3 at 10.[3] In response to the 7362 form Avila saw plaintiff the next day, at which time he complained that his foot felt like it was asleep, and that it grew cold.[4] DSUF ¶ 8. Avila

---

[1] While plaintiff does challenge the acceptability of defendants' treatment and diagnosis recorded in the documents, he does not allege that the contents of the documents are inaccurate.
[2] Plaintiff's first amended complaint was signed under penalty of perjury (ECF No. 14 at 6) and "[a] plaintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence." Lopez v. Smith, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc) (citation omitted).
[3] Minor grammatical and spelling errors will be corrected without notation when quoting plaintiff's records.
[4] Plaintiff disputes DSUF ¶¶ 8-10 on grounds that Avila was not qualified to perform a cap refill exam, her observation that his toes were pale was unusual would have concerned a reasonable triage nurse, the exam was "grossly inadequate," and giving him Naproxen and a referral to his PCP suggests that her statements that he was not suffering from a serious circulatory issue are false. Response to DSUF ¶¶ 8-10. However, plaintiff does not actually dispute Avila's observations or that her conclusion is inaccurately reflected and DSUF ¶¶ 8-10 are therefore (continued)

7

examined plaintiff's right foot and performed a capillary refill ("cap refill") exam, noting that the toes on his right foot had good cap refill that was within normal limits and that she did not see any unusual or concerning discoloration other than some paleness in the toes. Id. A cap refill exam consists of pressing down on various locations of the limb or body part—ankle, foot, and toes in plaintiff's case—to disperse the blood from the affected area and then removing the pressure, causing the capillaries to refill with blood, and seeing how long it takes for the blood to return and the normal color to return to the skin. DSUF ¶ 9. Because plaintiff's cap refill was strong, Avila concluded he did not have a peripheral circulatory or vascular issue and provided plaintiff with Naproxen for his foot pain and scheduled him for a routine appointment with his PCP. DSUF ¶ 10.

On March 28, 2016, plaintiff saw Christensen for complaints of right foot pain and numbness. ECF No. 77-3 at 14. During the visit, plaintiff reported that "he has a circulatory or nerve problem in his right foot" and that

> he feels like his right foot goes numb and has sharp pain with pins and needles several times per day. He feels like it is really cold. He puts it in warm water in the sink. He states that his right bit and 2nd toe are purple and he feels that it is a lack of circulation. He also complains of right leg weakness.

Id. Christensen performed a complete physical and neurological exam, finding plaintiff's gait, movement, and pedal pulse in both feet to be within normal limits; the temperature and skin on his feet to be warm and dry; that sensory in both feet was intact; and that his right big toe was developing a bunion, causing a red, purple discoloration.[5] DUSF ¶ 13. Based on her exam, Christensen determined that plaintiff was not suffering from restricted blood flow or other circulatory issues and the discoloration on his big toe was consistent with the location where his

////

---

deemed admitted. To the extent plaintiff argues that Avila was unqualified or her conclusions were incorrect, such arguments will be addressed in the discussion.

[5] Plaintiff objects to DSUF ¶ 13 on the ground that the exam was inadequate because it would have revealed his circulatory issues. Response to DSUF ¶ 13. However, plaintiff is not competent to provide an opinion on the adequacy of the exam and DSUF ¶ 13 is therefore deemed admitted.

8

shoe was rubbing against his boot and a bunion was developing.[6] DSUF ¶ 14. She concluded that his foot pain and right leg weakness were due to nerve pain or impingement given his history of lower back pain, and ordered x-rays of his lower spine and right foot, prescribed medication for neuropathic pain, and ordered a follow-up appointment in thirty to fifty days. Id. Plaintiff's x-rays came back normal.[7] DSUF ¶ 15.

Around April 14, 2016, plaintiff submitted two requests for medical care for severe pain to his right foot and toes, complaining his big and second toes were swollen, bruised, and cold to the touch. DSUF ¶ 16; Response to DSUF ¶ 16. Avila received plaintiff's requests on April 20, 2016, and saw him the same day. DSUF ¶ 17; Response to DSUF ¶ 17. Plaintiff complained he was having sharp pain and throbbing in his first and second toes of the right foot as if they had been smashed and that the pain medication was not providing relief. Id. Avila observed spotted discoloration to the first and second toes on plaintiff's right foot, and upon examination found he had good cap refill, circulation, sensation, and movement of those toes. DSUF ¶ 18; Response to DSUF ¶ 18. She did not see any swelling or bruising, but his toes were cold to the touch. Id.

Avila called Greenleaf for guidance on plaintiff's symptoms and to obtain guidance on how to proceed with plaintiff's care.[8] DSUF ¶ 19; Response to DSUF ¶ 19. Avila's notes state "PCP Friday 4/22/16 per Dr. Greenleaf who refused to see him in TTA. He was informed of discoloration, cold, numb toes." ECF No. 77-3 at 20. Greenleaf determined plaintiff's condition was not life- or limb-threatening or an emergent condition and did not require transfer to the TTA, based on what Avila told him about plaintiff's symptoms and results of the exam.[9] DSUF ¶

---

[6] Plaintiff objects to DSUF ¶ 14 on the grounds that Christensen's conclusion is "intentionally misleading." Response to DSUF ¶ 14. Plaintiff provides no basis for this assertion or competent evidence to dispute defendant's conclusion and DSUF ¶ 14 is therefore deemed admitted.
[7] Plaintiff disputes DSUF ¶ 15, arguing that when his x-rays came back negative Christensen should have ordered additional tests. Response to DSUF ¶ 15. However, he does not dispute that his x-rays were normal and DSUF ¶ 15 is deemed undisputed.
[8] Plaintiff does not dispute that Avila called Greenleaf, but instead objects to the summary of Avila's motive for calling as misleading based on her notes. Response to DSUF ¶ 19. This portion of DSUF ¶ 19 is therefore deemed undisputed.
[9] Plaintiff disputes DSUF ¶ 20 on the ground that a "reasonable physician would have conducted a thorough review of Plaintiff's relevant history." DSUF ¶ 20. However, plaintiff does not dispute the information Greenleaf was provided or assert that his conclusion is inaccurately (continued)

20. Plaintiff's good cap refill indicated that his foot and toe pain were unrelated to any possible circulatory issues, otherwise he would not have had normal blood flow and refill of his capillaries. Id.

On April 24, 2016, plaintiff submitted a medical request complaining that his toes were "black and blue with blood pockets," that his pain medication was not working, and that he was supposed to see a doctor a few days earlier but did not. DSUF ¶ 21; Response to DSUF ¶ 21. A nurse saw him that same day and described his big toe as "discolored purplish with spots of blue/purple" and described his cap refill as "brisk" with positive pedal pulse. Id. The nurse informed him he was scheduled to see his PCP on May 2, 2016. Id. Four days later, plaintiff submitted another 7362 form requesting to stop taking his nerve pain medication because it was causing him migraines and headaches. DSUF ¶ 22; Response to DSUF ¶ 22. Avila responded to the request the following day and forwarded it to Christensen, who discontinued the medication. DSUF ¶ 23; Response to DSUF ¶ 23. Avila noted that plaintiff was scheduled to see his PCP on May 2, 2016, and Christensen was not provided with any additional information about plaintiff's condition beyond his request to discontinue his medication. Id.

On May 2, 2016, Christensen saw plaintiff for his complaint of foot pain as directed by Greenleaf on April 20, 2016.[10] DSUF ¶ 24. Christensen examined plaintiff and observed that he had a papular rash without vesicles (raised bumps without blisters) on the arch of his right foot, purple lesions (one to two millimeters in diameter) on the top and bottom of his big and second toes, and a vesicle tip (fluid-filled blister) on his second toe. Id. She diagnosed him with shingles; prescribed him Acyclovir, Tylenol with codeine (T3), and ibuprofen; ordered a cane to

////

---

reflected and DSUF ¶ 20 is therefore deemed admitted. To the extent plaintiff argues that Greenleaf's was conclusions or conduct were unreasonable, such arguments will be addressed in the discussion.

[10] Plaintiff objects to DSUF ¶ 24, arguing that Christensen misdiagnosed him without examining any other part of his body or ordering a blood test to confirm her diagnosis. Response to DSUF ¶ 24. Plaintiff does not actually dispute Christensen's findings or diagnosis and DSUF ¶ 24 is therefore deemed admitted. To the extent plaintiff argues the diagnosis was incorrect, such arguments will be addressed in the discussion.

relieve pressure while walking; and had him scheduled for a follow up appointment in ten to twenty-five days. Id.

On May 12, 2016, plaintiff requested a refill of his ibuprofen, which Avila processed the next day. DSUF ¶ 25; Response to DSUF ¶ 25. On May 14, 2016, plaintiff filed a 7362 form complaining of continuing foot and toe pain and requesting a housing accommodation and that his T3 prescription be extended. DSUF ¶ 26; Response to DSUF ¶ 26. On May 16, 2016, Avila saw plaintiff in response to his May 14, 2016 request. ECF No. 77-3 at 30. She noted that plaintiff complained he was "still having the same problem. The abx didn't help. My toes are blistering now. 6/10 sharp/throbbing pain 'pins & needles' my R thigh is super fatigued too." Id. The notes further indicate that plaintiff's first and second toes on his right foot "still have purple spots & obvious open blisters to the 2nd toe." Id. Avila noted that plaintiff's PCP was co-consulted and under the assessment section she noted "pain r/t shingles." Id. Christensen also saw plaintiff that day to follow up on the status of his shingles and pain in his right foot. DSUF ¶ 28; Response to DSUF ¶ 28. She observed that the rash on his right foot and toes was resolving but still present on the toes, and plaintiff still reported having foot pain. Id. Plaintiff was also experiencing right sciatic pain with cramping of the right thigh that affected his mobility and Christensen renewed the T3 prescription to address the foot and nerve pain. Id. She also ordered a cane since plaintiff still had not received one, and ordered he be housed in a ground-level cell in a lower bunk to accommodate his mobility concerns with a follow up appointment in thirty to fifty days. Id.

On May 29 and June 9, 2016, plaintiff requested his ibuprofen prescription be renewed and it was refilled shortly thereafter. DSUF ¶ 29; Response to DSUF ¶ 29.

On June 14, 2016, plaintiff submitted a 7362 form that stated the following:

> I was supposed to see the doctor about a follow-up on my foot pain from shingles but due to the lockdown wasn't able to. I'm still in a lot of pain in my big toe & the pins & needles feeling is getting stronger. The toe next to the big one is fully healed now. Can you schedule me to see the doctor again please.

ECF No. 77-3 at 38. Avila saw plaintiff the next day, on June 15, 2016, where he stated his big toe had improved for several weeks but had recently begun to hurt again, that his boots and cold

11

made the pain worse, and he complained of muscle weakness.[11]  DSUF ¶ 31.  Avila also observed that the spots on his toes were improving, noted that he had pain medication available, and scheduled him to his PCP.  Id.  When Christensen saw plaintiff on June 28, 2016, to follow up on his shingles, plaintiff informed her his foot pain had resolved, his foot and leg felt great, and that he wanted to return the cane and have the housing accommodation order removed.[12]  DSUF ¶ 32.  Christensen observed that plaintiff walked with a normal gait and removed the accommodations as requested.  Id.

On October 15, 2016, plaintiff submitted a health care request stating "I have severe back pain & my sciatic nerve problem is worse than ever."  ECF No. 77-3 at 39.  He was seen by Avila two days later and the notes do not reflect any mention or examination of plaintiff's foot or toes.  Id. at 43-45.  On October 31, 2016, plaintiff was seen by a medical provider for complaints of lower back pain.  Id. at 46.  The provider's notes to do not reflect any complaints about or examination of plaintiff's feet or toes and state that plaintiff was "[o]bserved to ambulate w/out evidence of limping or pain."  Id.

On November 27, 2016, plaintiff submitted a request to refill his ibuprofen and Tylenol, which it appears Avila refilled.  Id. at 47.  On December 28, 2016, Avila received and reviewed another 7362 form submitted by plaintiff requesting a refill of his ibuprofen and Tylenol and stating that he needed to be seen about his back pain because it had gotten worse.  Id. at 48.  The same day, plaintiff refused to be seen by triage, stating he wanted "to be referred to PCP for PT."  Id. at 49.  Plaintiff was seen by a medical provider on January 11, 2017, regarding his complaint of continued lower back pain.  Id. at 50.  The notes do not reflect any discussion or examination

---

[11] Plaintiff "disputes and objects to Defendants standard for the improvement of plaintiff's condition that is based on Avila's unqualified observations" and "grossly erroneous conclusions."  Response to DUSF ¶ 31.  However, plaintiff does not actually dispute Avila's observations or assert that her conclusion is inaccurately reflected and DSUF ¶ 31 is therefore deemed admitted.  To the extent plaintiff argues that Avila was unqualified or her conclusions were incorrect, such arguments will be addressed in the discussion.

[12] Plaintiff objects to DSUF ¶ 32 asserting that "it is unclear if Christensen actually examined [his] right foot and leg" and that he objected to any reliance on third-party or hearsay statements not supported by the record, evidence, or sworn statements.  Response to DSUF ¶ 32.  Since DSUF ¶ 32 does not state that Christensen examined plaintiff's leg, and plaintiff does not identify what statements are at issue, it is deemed undisputed.

of plaintiff's feet or toes and indicate he walked with a normal gait. Id. A week later, plaintiff submitted a health care request stating that he had "severe pain in [his] back," that he needed an MRI and medication for the pain, and that he had not received Cymbalta yet. Id. at 52. The request was reviewed by Avila the following day and his prescriptions were addressed. Id. at 52-58.

On January 21, 2017, plaintiff prepared a 7362 form complaining that he was in severe pain and that his toes were numb, black-and-blue, and blistering similar to when he was diagnosed with shingles and nursing staff received his request the next day. DSUF ¶ 34; Response to DSUF ¶ 34. On January 22, 2017, plaintiff prepared another 7362 form stating the discoloration in his toes was rapidly spreading and he had blisters and blood pockets and nursing staff received this request the following day. DSUF ¶ 35; Response to DSUF ¶ 35.

On January 23, 2017, Christensen saw plaintiff for his numb, cold, and discolored right toes. DSUF ¶ 36; Response to DSUF ¶ 36. Plaintiff informed Christensen his toes turned blue four or five days prior, that warming his toes in water brought back some color, and he felt a burning sensation on top of his foot and pain from his back down his leg to his foot. Id. Christensen examined his right foot and noted the big, third, and fourth toes appeared blue, were cold, and had a decreased pedal pulse. Id. She immediately arranged for plaintiff's transfer to an outside facility for a higher level of care. Id.

Plaintiff was admitted to the non-prison hospital, where he remained for over a month, and underwent two surgical procedures, including amputation of the right, third toe tip.[13] DSUF ¶ 37. He was diagnosed with "chronic arterial insufficiency with gangrene and deep vein thrombosis of the right leg and calf and suffered an acute pulmonary embolism while adjusting to his anticoagulant medication." Id. The notes from the hospital reflect the following:

> History indicated the patient had previous thromboembolic events to the right lower extremity that had caused obstruction of all 3 tibial vessels and also occlusion of the profunda femoral sharper on the

---

[13] Plaintiff disputes the representation in DSUF ¶ 37 that the records reflect his condition was caused by clinical hypercoagulable state, which is a genetic disorder. Response to DSUF ¶ 37. Because that is the only portion of the statement plaintiff disputes, the remainder of DSUF ¶ 37 is deemed undisputed.

> right side, this was see [sic] on CT angiogram that was obtained in the emergency room. The patient was not having neurologic deficits on the right foot at that time. The conclusion was this was chronic disease exacerbated by environmental exposure that had led to essentially frostbite of 2 of toes on the right foot. . . . He was not maintained on a full dose therapeutic anticoagulation [post-surgery] because his history indicated an isolated thromboembolic event and multiple recurrent events and therefore, there was low concern for underlying hypercoagulable state.

ECF No. 77-3 at 63-64. When plaintiff's leg began to swell, it was determined that the repair was occluded and he was sent back to surgery. Id. at 64. After plaintiff's second surgery, his leg began to swell again and it was determined that he had developed a deep vein thrombosis. After discovering the deep vein thrombosis, the doctor noted "[a]t this point, we have concern for the patient having any underlying clinical hypercoagulable state and he was switched full does therapeutic Lovenox, as soon as the DVT was identified." Id. Upon discharge, the doctor stated that plaintiff

> will be maintained on therapeutic anticoagulation for at least 6 months, although given his clinical history of multiple thromboembolic events. The [sic] patient will likely need lifelong anticoagulation. Hypercoagulability workup could not be sent during the hospitalization because patient was on Lovenox and Coumadin from the recognition of the pulmonary embolism onward, but after 6 months of treatment, I can stop the anticoagulation and sent her [sic] hypercoagulable workup. Even though I believe the clinical necessitate lifelong anticoagulation regardless.

Id.

Plaintiff returned to HDSP on February 24, 2017, and was admitted to the prison's hospital for monitoring. DSUF ¶ 38; Response to DSUF ¶ 38. Greenleaf oversaw plaintiff's recovery until he was discharged to his housing unit on March 6, 2017. Id. Greenleaf ensured plaintiff was referred to specialists for further treatment of his hypercoagulable state. Id. Plaintiff has no complaints about Greenleaf's care after his surgeries and return to HDSP. DSUF ¶ 39; Response to DSUF ¶ 39.

VIII. Discussion

    A. Deliberate Indifference

As set forth above, the parties largely agree as to the events and timeline. Their dispute instead centers over whether defendants' conclusions about plaintiff's condition and the treatment

14

they provided were medically acceptable.

Defendants argue that they did not ignore plaintiff's needs. DSUF ¶¶ 40-42; ECF No. 77-1 at 13-19. They assert that on the occasions Avila saw or treated plaintiff, she reviewed his records and listened to his complaints, and based on her training and experience she provided care or pursued a course of action that was medically indicated and that she believed appropriate for the conditions or symptoms presented. DSUF ¶ 40; ECF No. 77-1 at 15. On the dates plaintiff saw Christensen prior to January 23, 2017, no medical evidence indicated he suffered from a circulatory issue or poor blood flow to his right leg, foot, or toes. DSUF ¶ 41; ECF No. 77-1 at 17-18. Based on her training and experience and plaintiff's symptoms, Christensen determined plaintiff's right leg and foot pain, rash, and other symptoms were related to or caused by nerve pain and shingles, and she pursued appropriate treatment consistent with those conditions. Id. Finally, defendants argue that prior to February 2017, Greenleaf had no information from which he could reasonably infer plaintiff had a condition involving the circulation to his right leg and foot because, while some of his symptoms could indicate a circulatory issue, plaintiff had good cap refill. DSUF ¶ 42; ECF No. 77-1 at 18-19. Based on Greenleaf's training and experience, a patient does not have good cap refill if he is experiencing poor blood flow to a limb, especially if there is no history of blood clotting, and Greenleaf's medical opinion was that plaintiff was not at substantial risk of serious harm to his health if he was not seen in the TTA after the April 2016 encounter. Id.

Plaintiff disputes and objects to defendants' statements as self-serving statements that were not subjected to cross-examination. Response to DSUF ¶¶ 40-42. He further argues that defendants repeatedly dismissed his requests for treatment, their opinions were unreasonable, they should have pursued other diagnostic testing, they reached clearly incorrect conclusions regarding his condition, their summaries of his records are misleading, and they are attempting to blame plaintiff for failing to seek medical attention between June 28, 2016 and January 18, 2017. ECF No. 80 at 2-15, 18-19, 21-22.

While plaintiff argues that defendants' summaries of some of the records are "misleading" because they omit specific sentences regarding plaintiff's complaints, the court finds the

summaries of the records to be accurate. Moreover, as already addressed above, the court has considered the contents of the records directly where plaintiff has claimed defendants have misrepresented them. The record demonstrates unequivocally that defendants saw plaintiff in response to each of his requests for medical care and established a course of treatment based on their findings, including scheduling plaintiff for follow-up visits. Because the undisputed record clearly shows that plaintiff was promptly seen in response to each of his requests for treatment and then received treatment, the court turns to plaintiff's arguments regarding the appropriateness of the treatment he received. The court finds that the undisputed evidence demonstrates that defendants, all trained medical professionals, considered plaintiff's complaints of numbness, discoloration, pain, and tingling in his right leg, foot, and toes, but ultimately ruled out circulatory issues because his cap refill was good and he had other indicators that his circulation was not an issue. As addressed below, plaintiff's attempts to create a material dispute as to this evidence are unsuccessful.

Plaintiff argues "[h]e knew exactly what was ailing his right foot from the first CDC 7362 he submitted on March 20, 2016, where he unequivocally states that his condition 'looks like lack of blood flow.'" ECF No. 80 at 16. He further asserts that the refusal to properly treat his condition "was the result of unqualified medical staff ignoring clear symptoms of lack of circulation persistently described by Plaintiff . . . and relying on diagnosis that no reasonable medical personnel would conclude without the utilization of empirical methods to validate their findings." Id. at 21-22. However, defendants have established that they are all trained medical professionals, and plaintiff has not shown that he has any medical training or other qualifications that would render him competent to offer an opinion as to the proper interpretation of defendants' findings, whether defendants were qualified, what diagnostic tests should have been ordered, or the medical acceptability of defendants' diagnoses and treatment. That plaintiff consistently believed he was suffering from a circulatory issue, and in January 2017 was ultimately found to have a circulation issue that resulted in his having two surgeries and a partial amputation of one of his toes, does not automatically render defendants' treatment "medically unacceptable." Plaintiff's own opinions as to his condition, diagnosis, and suggested treatment do not create a

dispute of a material fact, see Toguchi, 391 F.3d at 1058 (difference of opinion between inmate and prison medical personnel—or between medical professionals—regarding appropriate course of treatment does not by itself amount to deliberate indifference), and, at best, plaintiff has demonstrated defendants' conduct was negligent misdiagnosis, which is not deliberate indifference, see Wilhelm v. Rotman, 680 F.3d 1113, 1123 (9th Cir. 2012) (negligent misdiagnosis does not establish deliberate indifference); Estelle, 429 U.S. at 105-06 (negligent or inadequate medical care does not rise to the level of deliberate indifference).

Finally, the record reflects that when plaintiff last saw defendants in June 2016, Avila observed that the spots on his toes were improving and he reported improvement in his condition, after which plaintiff did not seek treatment for his foot again until January 21, 2017. Despite plaintiff's personal opinion that his lower back pain between June 2016 and January 2017 "was most likely caused by stress compensation due to 'multiple thromboembolic events' weakening his right leg" (Response to DSUF ¶ 33), there is no evidence, and plaintiff makes no allegation, that he complained about or sought treatment for his right foot or toes. While plaintiff asserts that defendants are "blaming the victim" by arguing that his issues resolved and he did not return until six months later, ECF No. 80 at 15-16, there is no explanation as to how defendants would have known that plaintiff's condition had started deteriorating again absent some notification from plaintiff. Without knowledge that plaintiff's condition was deteriorating, defendants cannot have been deliberately indifferent.

While the court recognizes that plaintiff's circumstances and the ultimate outcome are unfortunate and understandably frustrating, it cannot find, on this record, that defendants were deliberately indifferent to plaintiff's serious medical need.

        B.     Qualified Immunity

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (citations omitted). In analyzing a qualified immunity defense, the court must consider the following: (1) whether the alleged facts, taken in the light most favorable to the

17

plaintiff, demonstrate that defendant's conduct violated a statutory or constitutional right; and (2) whether the right at issue was clearly established at the time of the incident. Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled in part by Pearson v. Callahan, 555 U.S. 223, 236 (2009) (overruling Saucier's requirement that the two prongs be decided sequentially). Since the facts taken in the light most favorable to plaintiff do not show the violation of a constitutional right, it is not necessary for the court to address defendants' qualified immunity argument and the court declines to do so.

IX.     Conclusion

For the reasons set forth above, defendants' motion for summary judgment should be granted on the ground that the defendants did not demonstrate deliberate indifference to the plaintiff's medical needs and the court declines to address defendants' qualified immunity argument.

X.     Plain Language Summary of this Order for a Pro Se Litigant

The undisputed evidence shows that defendants were not deliberately indifferent to your medical needs when they treated you in 2016 and 2017. Although your medical records showed that you did suffer from a serious medical condition, there was no evidence that defendants' treatment was medically unacceptable.

CONCLUSION

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Defendants' motion for summary judgment (ECF No. 77) be GRANTED; and
2. Judgment be entered in favor of defendants.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that

////

////

failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: March 17, 2025

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE